IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**TIMOTHY VALDEZ,**

        Plaintiff,

vs.                                                                                              No. CIV 08-933 RHS

**MICHAEL J. ASTRUE,**
**Commissioner of the**
**Social Security Administration,**

        Defendant.


**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** is before the Court on Plaintiff Timothy Valdez's ("Valdez") Motion to Reverse and Remand Administrative Agency Decision, filed April 6, 2009. [Doc. 18, 19.] The Commissioner of Social Security issued a final decision denying benefits, finding that Valdez was not disabled and not entitled to Supplemental Security Income ("SSI") benefits or disability insurance benefits ("DIB"). The Commissioner filed a response to Valdez's Motion [Doc. 20], and Valdez filed a reply [Doc. 22]. Having considered the pleadings submitted by the parties, the administrative record and the applicable law, the Court grants Valdez's motion and remands for additional administrative proceedings.                .

I.      **PROCEDURAL RECORD**

In August 2004, Valdez applied for SSI and DIB[1] [AR[2] 35, 36, 52], alleging his disabling condition(s) began on August 1, 2003.[3] [AR 73, 81.] Valdez claimed that his ability to work was limited by: "Arms hurt and swell up, nerve damage upper extremities. Mental illness of depression and anxiety." [AR 61.] Valdez's applications were denied at the initial and reconsideration levels. [AR 33-36.] On October 18, 2006, the ALJ conducted an administrative hearing in Albuquerque, New Mexico, at which Valdez was represented by counsel. [AR 448.] On March 16, 2007, the ALJ issued a decision finding Valdez not disabled. [AR 18-26.] Thereafter, Valdez filed a timely request for review. On August 7, 2008, the Appeals Council denied Valdez's request for review and upheld the final decision of the ALJ. [AR 8.] On October 9, 2008, Valdez filed a Complaint for court review of the ALJ's decision. [Doc. 1.]

Valdez was born on December 8, 1967, and was 39 years old at the time of the ALJ hearing. [AR 450-51.] Valdez completed the 8th Grade and eventually obtained his G.E.D. in 1989, after five attempts. [AR 67, 451, 457.] One disability form notes that Valdez previously worked as a laborer with Parks and Recreation from the 1980's to 2003. [AR 73.] In that position, Valdez painted, tore up floors, erected walls, installed garage doors, answered telephones and detailed automobiles. [AR 74.] Valdez also stated that he worked for an automobile company and cleaned the building as well

---

[1] The actual application forms do not appear to be in the administrative record. The Court takes the filing dates from disability determination forms.

[2] The notation "AR" refers to page numbers of the transcript of the record of proceedings relating to this case, filed on December 29, 2008. [Doc. 13.] The Court observes that the case caption on the transcript [Doc. 13] contains an incorrect civil action number. However, with the exception of one transcript [AR 403-447], all of the documents and medical records pertain to Valdez.

[3] There are many inconsistencies in the administrative record, including allegations that Valdez's onset date of disability was both May 10, 2004 and August 1, 2003. [AR 61, 73.] Valdez also alleged that the purported limiting conditions first bothered him in 1974, as well as 1996. [AR 61, 73.]

as detailed cars and performed light mechanic's work. [AR 62.] The dates of that employment are unknown. Valdez's earnings are erratic. For example, he earned from $63.00 to $904.50 annually between 1983 to 1989. There are no recorded earnings in 1990-1992. Between 1993 and 1996, Valdez earned from $331.25 to $604.03 annually. In 1997 to 2003, Valdez earned from $1374.05 to $9397.09 annually. [AR57-58.] In 2006, Valdez worked part-time in a fast food restaurant, where he wiped tables, swept floors and mopped. He claimed he earned only about $400 per month from May through October; however, the ALJ observed that his 2006 earnings records reflect income of $7396, still below the level for substantial gainful activity, "but a great deal more than what the claimant stated he earned." [AR 20, 453.]

Valdez has six children from his first wife. [AR 451.] As of March 2005, he was living in Grants, New Mexico in a low-income apartment with three of his children. [AR 172.] In 2006, Valdez's three children were placed in the State's custody after Valdez spent one night in jail for alleged domestic violence. Valdez's older two daughters were in foster care, and his first wife had the remaining child. [AR 399.] Valdez was going through his third divorce at the time of the ALJ hearing. [AR 451.]

## II.     STANDARDS FOR DETERMINING DISABILITY

In determining disability, the Commissioner applies a five-step sequential evaluation process.[4] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining his burden at each step, the burden then

---

[4] 20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

shifts to the Commissioner at step five. If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[5]

Briefly, the steps are: at step one, claimant must prove he is not currently engaged in substantial gainful activity;[6] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . .;"[7] at step three, the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[8] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[9] If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[10] age, education and past work experience, he is capable of performing other work.[11]

At step five, the ALJ can find that the claimant met his burden of proof in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997). For example, expert vocational

---

[5] 20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[6] 20 C.F.R. § 404.1520(b) (1999).

[7] 20 C.F.R. § 404.1520(c) (1999).

[8] 20 C.F.R. § 404.1520(d) (1999). If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity." 20 C.F.R. § 416.925 (1999).

[9] 20 C.F.R. § 404.1520(e) (1999).

[10] One's RFC is "what you can still do despite your limitations." 20 C.F.R. § 404.1545(a). The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. § 405.1567 (1999).

[11] 20 C.F.R. § 404.1520(f) (1999).

testimony might be used to demonstrate that the claimant can perform other jobs in the economy. Id. at 669-670. If, at step five of the process, the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[12]

In this case, the ALJ did not utilize a vocational expert and relied on the grids for his finding of non-disability at step five of the analysis. [AR 25.] The Court observes that the ALJ, in possibly a boilerplate recitation of the five-step sequential process, inaccurately stated that at step five, the "claimant generally continues to have the burden of proving disability at this step," although "a limited burden of going forward with the evidence shifts to the Social Security Administration." [AR 20.]

The Tenth Circuit Court of Appeals explained if the claimant establishes at step four that he cannot return to his past relevant work, the burden of proof shifts to the Commissioner at step five to show he retains the RFC to perform work in the national economy, given his age, education and work experience. Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). In an unpublished opinion, the Tenth Circuit further stated that "[t]he claimant has no burden on step five." Stewart v. Shalala, 999 F.2d 548, at *1 (Table, Text in Westlaw), 1993 WL 261958 (10th Cir. Jun. 28, 1993) (*citing* Thompson v. Sullivan, 987 F.2d 1482, 1491 (10th Cir. 1993)). Thus, in accordance with pertinent legal standards, the ALJ should revise or clarify his summary of the five-step process.

## III.  STANDARD OF REVIEW

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Langley v.

---

[12]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004). The Court's review of the Commissioner's determination is limited. Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992). The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence. Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991). Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards. Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is disabled. Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Hamilton, 961 F.2d at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

After "careful consideration of all the evidence" [AR 18], the ALJ denied Valdez's request for benefits. [AR 18-25.] The ALJ determined, in part, that Valdez had not been engaged in substantial gainful activity since August 1, 2003, the alleged onset date; had severe impairments of chronic pain of the back, left knee and left arm, anxiety, depression and degenerative disk disease,[13] but that none of Valdez's impairments or combination of impairments met listing criteria; and, had the residual functional capacity to perform "a wide range of light work with moderate limitations in maintaining social functioning and in concentration." [AR 20-24.]

The ALJ further determined that Valdez could not perform any his past relevant work as a car detailer or laborer because he was required to lift more than 20 pounds in those positions. [AR 24.] The ALJ defined Valdez as a younger individual with a high school education. Transferability of job skills for Valdez was not material to the determination of disability because Valdez's past relevant work was unskilled. [AR 24.] After considering Valdez's age, education, work experience and RFC, the ALJ concluded that jobs existed in significant numbers in the national economy that he could perform. [AR 25.] As stated before, the ALJ did not utilize testimony from a vocational expert and instead, relied upon the grids for his finding of non-disability at step five. The ALJ noted that while Valdez had "moderate psychological limitations due to borderline intellectual functioning and an anxiety disorder, these additional limitations have only slight effect on the light, unskilled job base. Mr. Valdez can perform simple, repetitive work at the light level." [AR 25.]

---

[13] In determining which of Valdez's numerous alleged limitations were severe, the ALJ thoroughly addressed many of the medical records and complaints, including allegations of swelling of the arms, nerve damage in the upper extremities, back and knee pain, mental illness, lack of endurance, carpal tunnel syndrome ("CTS"), gastroesophageal reflux disease ("GERD"), testicular problems, prior use or abuse of alcohol and drugs, a Global Assessment of Functioning ("GAF") rating of 45, and psychological testing results of borderline intellectual functioning. [AR 21-22.]

## IV.    MEDICAL HISTORY AND BACKGROUND

Valdez's extensive medical records begin in 2002 and continue through 2006. During one year, Valdez visited medical care providers for treatment or testing as many as 33 times. (*See, e.g.,* 2004 medical records, AR 138-146, 166-168, 231-284, 397.] His complaints and alleged symptoms were numerous and generalized. One treating physician described Valdez as having generalized body aches that appeared psychosomatic. [AR 268.] The doctor further stated that Valdez had been "worked up" for the same problem and had undergone a "multitude of tests" that never revealed a cause for his symptoms. [AR 243.] Valdez hurt all over his body but there was no evidence of trauma and there were no objective findings of pain to confirm Valdez's complaints. [AR 277.]

Over the years, Valdez's medical complaints were wide-ranging and never ending. For example, he went to doctors, the hospital or ER for the following symptoms: blisters on his tongue and gums [AR 210, 216]; pain on the roof of his mouth [AR 216]; back pain [AR 210]; dry lips [AR 210]; dry cracks on his hands [AR 397]; right foot and arm pain [AR 284]; anxiety [AR 280]; dizziness and shortness of breath [AR 284]; pain in the right big toe [AR 284]; ear feels "funny" [AR 277]; acid reflux or GERD [AR 270]; "very superficial" laceration on the hand requiring a bandaid [AR 167]; insomnia [AR 247]; pain in the neck [AR 245]; infertility issues [AR 233]; migraine headaches [AR 71]; "slight heart attack" [AR 71]; not feeling "right" [AR 241]; numbness in his arms and face [AR 240]; double vision and trouble swallowing [AR 268]; testicular pain [AR 168]; nerve damage to upper extremities [AR 60]; depression [AR 60]; lung and heart problems [AR 353]; gastritis [AR 330]; pimple on his back [AR 325]; sebaceous cyst on chin [AR 226]; difficulty swallowing and choking while eating [AR 106]; bloating and a suffocating feeling [AR 30]; left finger and foot numbness [AR 292]; bumps on his throat [AR 371], pain in his left shoulder [AR 371]; hurts all over and has an infection [AR 392]; and fatigue [AR 392].

Many of Valdez's symptoms were tested and re-tested. Most x-rays, MRI's and scans were negative. [*See, e.g.,* AR 388 (left hand); AR 394 (left knee x-ray); AR 212 (number of tests); AR 185 (cardiac work-up); AR 391 (chest x-ray); AR 262 (chest x-ray or scan); AR 267 (abdominal ultrasound); AR 142 (videofluoroscopic swallowing assessment for dysphagia); AR 251 (CT scan of abdomen); AR 242 (abdominal ultrasound); AR 122 (lab work); AR 120 (abdominal ultrasound); AR 118 (CT pelvis); AR 335 (exercise stress test); AR 332 (respiratory testing); AR 329 (chest x-ray); AR 326 (MRI cervical and thoracic spine);[14] AR 322 (testicular and scrotal ultrasound); AR 110 (speech evaluation and testing of swallowing); AR 311 (lateral chest x-ray); AR 106 (GI work up); AR 307 (left knee x-ray); AR 295 (chest x-ray); AR 289 (right foot x-ray); and 372 (shoulder x-ray).

On March 17, 2004, Valdez's treating physician, Dr. Kathard discussed Valdez's symptoms with him extensively and told him no more testing would be done since Valdez had been tested at length for three years. The symptoms appeared "marginally generalised and I don't find anything new." [AR 268.] It appears that Dr. Kathard wrote on a different occasion that Valdez had "chronic somatic complaints" that appeared to be closely related to his personal relationships. [AR 210.] Dr. Kathard thought it was imperative that Valdez seek a psychiatric consultation because his symptoms appeared psychosomatic. [AR 268.] The administrative record does not confirm that Valdez followed up on Dr. Kathard's psychiatric referral.

---

[14]Valdez's attorney argues in his opening brief that the claimant suffered from "chronic neck pain, which radiates to upper extremity pain." [Doc. 19, p. 3.] Valdez underwent an MRI of his spin that "showed degenerative changes at the C5-C6 and C6-7 levels charactered by a disc bulges [sic] and spurring of the uncovertegbral joints. [Doc. 19, p. 3.] Counsel overstates the findings. The conclusion from testing was **mild** degenerative changes at C5-6 and C6-7. [AR 326.] There was a **minimal** right paracentral disc bulge with **slight** spurring. There was a "**very minimal** disc bulge and **slight** spurring at C6-7. [AR 326] (emphasis added). The Court advises counsel to accurately reflect the record and medical findings.

Valdez received various diagnoses and medical treatments over the years for some ailments. For example, he periodically took medications for GERD, depression, and pain. He had five hernia repairs over some period of time, although not all five are confirmed in the record. [AR 71.] Valdez had a carpal tunnel release procedure.[15] [AR 363.] He reported he had surgery on his right shoulder and that he had a cardiac catheterization. [AR 64, 71.] He had testicular surgery. [AR 260.]

While not directly pertinent to the ALJ's determinations, the Court observes that the administrative record is confusing as to Valdez's alcohol or illegal drug use. For example, in 2004, Valdez stated he had been a heavy drinker for seven to eight years in the past but was negative for alcohol use in the last two years. [AR 271.] Valdez also reported he had a DWI conviction in 2000 or 2001. He lost his driver's license then. [AR 455-56.] He claimed he was "clean and sober" since 2002 "but longer than that." [AR 455-56.]

In 2006, Valdez told a mental health counselor that he had not used alcohol in six years and had not used crack in one year. [AR 401.] During a psychiatric evaluation in 2005, Valdez reported that his prior substance abuse ended about four years earlier. [AR 172.] The examining psychologist noted that while Valdez denied alcohol use over the past four years, a review of the records indicated alcohol use approximately one year or more before the 2005 examination. [AR 173.] A 2004 medical record indicates Valdez reported a history of alcohol abuse, but none for two years and a history of drug abuse but none for four years. [AR 257.]

---

[15]Valdez's attorney highlighted the fact that Valdez was left-hand dominant and tested positive for carpal tunnel in late 2000. [Doc. 19, p. 2.] Counsel accurately noted that test results in 2002 were "consistent with a clinically significant electromyographically significant left carpal tunnel syndrome" and that a surgeon performed a left carpal tunnel release on Valdez in November 2002. [Doc. 19, p. 2.] Counsel emphasized that even in 2006 Valdez continued to experience left hand pain and numbness after "this traumatic injury," he suffered in 2006. Counsel omits any explanation as to what the traumatic injury was. Medical records state that Valdez went to the ER on May 15, 2006 after he "punched wall." [AR 395.] A medical record, dated May 5, 2005, states "hand swollen, punched headstone." [AR 396.]

Valdez's account of his work history is unclear as well. As noted by the ALJ, Valdez admitted to working part-time in 2006, but significantly under-reported his earning record for that part-time work. In a June 2006 counseling record, Valdez stated he was currently working three part-time jobs, while Valdez testified at the administrative hearing in October 2006, that he was working only at Taco Village. [AR 399, 454.] During an interview with disability services in 2004, Valdez stated he stopped working four to five years ago. Yet, earning records indicate Valdez worked in 2000-2003. His highest earnings were from the years 2000, 2001 and 2003. [AR 57, 58.]

## V.     DISCUSSION

### A.     Alleged Legal Error

Valdez argues that the ALJ committed legal error at step five in conclusively applying the grids to determine that he was not disabled. Stated differently, the ALJ allegedly erred in directly applying the grids after finding that Valdez suffered from severe mental impairments, including depression, anxiety, and chronic pain. "Given the presence of both pain and non-exertional mental impairments, the Grids should not have been the exclusive means for the ALJ's decision making at step-five in this case, where the Grids consider only [] exertional . . . functional limitations." [Doc. 19, pp. 6-7.]

More specifically, Valdez states that the psychiatric impairments of Somatoform Disorder, Anxiety Disorder, NOS and Borderline Intellectual Functioning, as diagnosed by the consulting psychiatrist, Dr. LaCourt, precluded the use of the grids. According to Valdez, Dr. LaCourt's objectively supported psychological diagnoses resulted in findings that Valdez had moderate limitations in his abilities to understand and remember detailed/complex instructions, for sustained concentration and task persistency in carrying out instructions, and for social interaction with

11

coworkers and supervisors, all of which precluded use of the grids. Finally, Valdez argues that his chronic pain condition also precluded use of the grids.

When a claimant's residual functional capacity is diminished by both exertional and nonexertional impairments, the Secretary cannot conclusively apply the grids and instead, must produce expert vocational testimony or other similar testimony. In this case, as stated, the ALJ did not rely on expert vocational testimony or other similar testimony.

Defendant argues that the ALJ properly used the grids "as a framework" in determining that Valdez could perform other work existing in significant numbers in the national economy. [Doc. 20, p. 2.] Defendant notes that the ALJ relied on Valdez's treating physician's opinion that Valdez had no functional limitations. Defendant further contends that the ALJ correctly determined that Valdez's mental limitations "would not substantially erode the occupational base for light, unskilled work activity as his mental restrictions would only have a 'slight effect' on the base." [Doc. 20, p. 3.]

      B.      Step Five–Use of Grids and/or Vocational Expert

The fact that a claimant has both exertional and nonexertional impairments does not always mean vocational testimony must be presented. In other words, the mere presence of a nonexertional impairment does not automatically preclude the use of grids. Instead, the nonexertional impairment must interfere with the ability to work. *See* Ray v. Bowen, 865 F.2d 222, 225 (10th Cir. 1989). "[A] nonexertional impairment can have a negligible effect on the range of jobs available." Talbot v. Heckler, 814 F.2d 1456, 1465 (10th Cir. 1987). An ALJ may conclusively rely on the grids if he determines that the claimant has no significant nonexertional impairment and the claimant can perform most of the jobs at a particular exertional level, so long as these findings are supported by substantial evidence. Thompson v. Sullivan, 987 F.2d at 1488.

However, "[a]utomatic application of the grids is appropriate only when a claimant's RFC, age, work experience, and education precisely match a grid category." Gossett v. Bowen, 862 F.2d 802, 806 (10th Cir. 1988) (internal citations omitted). The grids will not apply in all cases and "some claimants may possess limitations that are not factored into the guidelines." Heckler v. Campbell, 461 U.S. 458, 462 n. 5 (1983). "[R]esort to the grids is particularly inappropriate when evaluating nonexertional limitations such as pain and mental impairments." Hargis v. Sullivan, 945 F.2d 1482, 1490 (10th Cir. 1991) (internal citation omitted). In cases where nonexertional limitations exist, "the grids generally may serve only as a framework to determine whether sufficient jobs exist within a claimant's range of RFC." Id.

Moreover, when a claimant's RFC is diminished by both exertional and nonexertional impairments, "the Secretary must produce expert vocational testimony or other similar evidence to establish the existence of jobs in the national economy. Hargis, 945 F.2d at 1491 (internal citation omitted). "A severe mental impairment is such a nonexertional impairment." Id.

Here, the ALJ determined that Valdez had both exertional and nonexertional impairments at step two. The nonexertional impairments were "chronic pain of the back, left knee and left arm, anxiety, depression." [AR 20.] By definition, "[a]n impairment or combination of impairments is 'severe' within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities." [AR 19.] Thus, the ALJ's step two findings amounted to a determination that Valdez suffered from nonexertional impairments that significantly limited his ability to perform basic work activities. To decide at step five, without vocational or other similar testimony, that Valdez's moderate psychological limitations have only a "slight effect on the light, unskilled job base," [AR 25] is contrary to the express step two findings and unsupported by substantial evidence.

13

At most, under the circumstances of this case, the grids should have served only as a framework in determining whether sufficient jobs remained with Valdez's range of RFC. While the ALJ stated in his opinion that the grids provided a framework for his decision-making, *e.g.,* "A finding of 'not disabled' is therefore appropriate under the framework of this rule," [AR 25], the ALJ actually relied conclusively on the grids. *See* Ramirez v. Astrue, 255 F. App'x 327, 330 n. 1, 2007 WL 4124475 (10th Cir. Nov. 20, 2007) (observing that while the ALJ stated in his written decision that he used the grids only as a "framework," the fact that he failed to develop any vocational testimony indicated he "in fact applied the grids conclusively to 'direct' a finding of 'not disabled.'") Indeed, here, the ALJ neither had a VE on hand at the administrative hearing, nor did he explain in his decision why vocational testimony was unnecessary.

## VI.  CONCLUSION

The Court determines that the ALJ erred in failing to produce vocational testimony at step five in the evaluation of this case, and that substantial evidence does not support the ALJ's findings that Valdez's "additional limitations," *i.e.,* the severe nonexertional impairments, had "little or no effect on the occupational base of unskilled light work." [*See* AR 25.] Moreover, the ALJ failed to support his finding, with substantial evidence, that Valdez's "moderate psychological limitations had only a light effect on the light, unskilled job base." Therefore, the ALJ's ultimate finding of non-disability at step five is unsupported by substantial evidence, and the case must be remanded for additional administrative proceedings.

Upon remand, the ALJ must consider whether a vocational expert should be utilized in light of the combination of severe exertional and nonexertional impairments and must consider the combined impact of all exertional and nonexertional impairments. If the ALJ again decides that he may conclusively rely on the grids at step five, he should provide reasoning why vocational

testimony is unnecessary. More precisely, in the absence of vocational testimony, substantial evidence must support express findings that Valdez has no significant nonexertional impairment(s), which would be difficult in view of the step two findings that Valdez had severe nonexertional impairments. Substantial evidence must also support findings that Valdez can do the full range of work[16] at some RFC level on a daily basis, and that he can perform most of the jobs in that RFC level. *See* Thompson, 987 F.2d at 1488 (describing when the ALJ can rely conclusively on the grids).

IT IS THEREFORE ORDERED that Plaintiff Valdez's motion for remand is GRANTED and that this matter is REMANDED for additional administrative hearings as described herein.[17]

*Robert Hayes Scott*
ROBERT H. SCOTT
UNITED STATES MAGISTRATE JUDGE

---

[16] The social security regulations use the phrases "full range" and "wide range" interchangeably. *See* 20 C.F.R. § 416.967(b). Thus, it does not appear that the phrases have different meanings, at least with respect to light work. *See* Moore v. Barnhart, 315 F. Supp. 2d 1141, 1143 (D. Kan. 2004).

[17] In remanding this matter, the Court does not indicate any view on the strength of Plaintiff's case. In other words, no particular result is dictated upon remand.